# EXHIBIT F

# DOG n SUDS
## MARK'S and PRODUCT
## LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("Agreement') is made and entered into this **1st** day of **July**, 2007 by and between TK&C's LLC an Indiana Corporation ('Licensor") and ("Licensee") **Airline Dog n Suds, Inc.**

### RECITALS:

Licensor, as the result of the expenditure of time, skill, effort and money, has developed and owns unique and distinctive trademarks (the " Marks") and Products (the "Products") relating to the sale of hot dogs, root beer and other related food items.

Licensor identifies itself by means of certain trade names, service marks, trademarks, logos, emblems and indicia of origin, including, but not limited to, the mark "DOG n SUDS®" here in after will be referred to as the Marks. Licensor also identifies itself by certain unique food and beverage products with secret receipts specifically its Coney Sauce and BIB Root Beer products along with the imprinted Paper Products will here in after be refereed to as the Products in this License Agreement

Licensee desires to use the Marks in connection with the operation of a business with the location specified in Section I hereto ("Location").

NOW, THEREFORE, the parties, in consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

### Section I - GRANT.

A. Licensor hereby grants to Licensee, and Licensee hereby accepts, subject to the terms and conditions of this Agreement, the right, license and privilege to use the Marks and Products in the operation of a food related business for a period of five (5) years from the date of this Agreement in the location specified in subparagraph B below ("Location"). Other than the rights expressly granted herein, nothing contained in this Agreement shall be construed to vest in the Licensee any right, title or interest in, under or to the Marks,

B   The Location,
Street address **4221 Grand Haven Rd.**
City **Norton Shores**   State **MI**
Zip Code **49441**   County **Muskegon**

C. This agreement does not grant to Licensee any protected territorial rights or the right or license to use the Marks or to offer or sell any products or described under this Agreement at or from any site other than the location

D.  Nothing herein or in any other agreement between Licensor and Licensee shall restrict, at any time  Licensor or its affiliates from offering for sale at any location bottled, canned and pre-processed DOG n SUDS® products from vending machines, grocery stores and other retail outlets for off-site consumption by the general public.

## SECTION II- PERMITS AND COSTS.

A.  Licensee assumes all cost, liability, expense and responsibility for constructing and equipping the business.

## SECTION III - TERM AND RENEWAL.

A.  Unless sooner terminated as provided in Section XII hereof, the term of this Agreement shall commence on the date of execution stated on the first page of this Agreement and continue in full force and effect until the expiration of five (5) years from the date of the opening of the Restaurant (the "Opening Date"). Upon expiration of the initial five (5) year term of the Agreement, Licensee shall have the right to renew this Agreement and the license granted hereunder, for an additional term of five (5) years provided that Licensee is not then in default of this Agreement. This License agreement is not transferable to another party or person by the Licensee during the term of this agreement.

## SECTION IV - FEES.

A.  Licensee shall pay to Licensor a license fee of Five Thousand Dollars, ($5,000.00). The license fee shall be due and payable upon execution of this Agreement.

## SECTION V - OPERATIONS.

A.  Licensee shall maintain the business where the Marks are displayed and the products sold in a high degree of sanitation, repair, and condition

C.  Licensee shall obtain Products from suppliers, distributors, warehouses and other sources who continue to demonstrate the ability to meet Licensor's then-current standards and specifications for food and beverage items, ingredients, supplies, materials, and other items used or offered for sale to Licensee and who possess adequate quality controls and capacity to supply Licensee's needs and distribute promptly and reliably over an extended period of time: and who have been approved in writing by Licensor prior to any purchases by Licensee from any such supplier and who have not thereafter been disapproved by Licensor. If Licensee desires to purchase, lease or use any products or other items from an unapproved supplier, Licensee shall submit to Licensor a written request for such approval, or shall request the supplier itself to do so, Licensee shall not purchase or lease from any supplier until and unless such supplier has been approved in writing by Licensor. Licensor may make a profit on the sale of its proprietary items to Licensee.

D.  Licensee shall comply with all requirements of federal, state and local laws, rules, regulations, and orders that apply to the use of the Products.

E.  To permit Licensor or its agents, at any reasonable time, to remove a reasonable number of samples of the Products from Licensee's inventory in amounts reasonably necessary for testing by Licensor or an independent laboratory to determine whether such samples meet Licensor's then-current standards and specifications. In addition to any other remedies it may have under this Agreement, Licensor may require Licensee to bear the cost of such testing if Licensor has not previously approved the supplier of the item.

F.  Licensee acknowledges and agrees that Licensor and its affiliates have developed and may develop for use certain products which are prepared from highly confidential secret recipes and which are trade secrets of Licensor, including, without limitation, Coney Sauce, TexMex Chili Sauce and BIB Root Beer ingredients, as well as any other secret recipe products now or hereafter designated by the Licensor. Because of the importance of quality and uniformity of production and the significance of such products, it is to the mutual benefit of the parties that Licensor closely controls the production and distribution of such

products. Accordingly, Licensee agrees that Licensee shall use only Licensor's secret recipe products consisting of its Coney Sauce, TexMex Chile Sauce and BIB Root Beer Ingredients as well as its branded paper goods and any other new or different products required by Licensor for use by Licensee's units in conjunction with the use of the Marks and no other like products after the date of this Agreement Current "Mandatory Menu items in conjunction with the marks are Coney Dog's Dog n Suds Branded BIB Root Beer and Texas Burger (the "Mandatory Menu Items"), and shall purchase solely from Licensor or its affiliates all of Licensee's requirements for such items. Notwithstanding the foregoing, Licensee shall have the right to purchase any products (other than Mandatory Products) for the Restaurant from any supplier(s) selected by Licensee, provided that such products meet Licensor's specifications.

G. Licensee shall require all advertising, promotional materials, signs, decorations and paper goods used in conjunction with the Marks to bear the Marks in the form, color, location and manner prescribed by Licensor.

H. Licensee shall process and handle all consumer complaints connected with or relating to the Products, and shall promptly notify Licensor by telephone or in writing of all of the following complaints: (i) food related illnesses, (ii) safety or health violations~ (iii) claims and (iv) any other material claims against or losses suffered by Licensee.

## SECTION VI  MARKS and PRODUCTS

A. Licensor grants Licensee the right to use the Marks and Products during the term of this Agreement in connection with the operation of the Restaurant. Licensor represents and warrants that it owns the Marks and Products and has the right to authorize Licensee to use the same.

B. Licensee expressly understands and acknowledges that Licensee must use the Marks and Products in order to display the name Dog and Suds at the location listed in Section 1-B

(1) As between Licensor and Licensee, Licensor is the owner of all right, title and interest in and to the Marks and the goodwill associated with and symbolized by them.

(2) Licensee shall not take any action that would prejudice or interfere with the validity of Licensor's rights with respect to the Marks. Nothing in this Agreement shall give the Licensee any right, title, or interest in or to any of the Marks or any of Licensor's service marks, trademarks, trade names, trade dress, logos, copyrights, or proprietary materials, except the right to use the Marks and Products in accordance with the terms and conditions of this Agreement in the operation of the Restaurant and only at or from the Location or in approved advertising related to the Restaurant.

(3) Licensee understands and agrees that any and all goodwill arising from Licensee's use of the Marks and Products shall inure solely and exclusively to Licensors benefit, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Licensee's use of the Marks.

(4) Licensee shall not contest the validity of the interest of Licensor or any of its affiliates in the Marks or assist others to contest the validity of the interest of Licensor or any of its affiliates in the Marks.

(5) Licensee acknowledges that any unauthorized use of the Marks shall constitute an infringement of Licensor's rights in the Marks and a material event of default hereunder. Licensee agrees that it shall provide Licensor with all assignments, affidavits, documents, information and assistance Licensor reasonably requests to fully vest in Licensor all such rights, title, and interest in and to the Marks, including all such items as are reasonable requested by Licensor to register, maintain, and enforce such rights in the Marks.

C. With respect to Licensee's use of the Marks pursuant to this Agreement, Licensee further agrees that:

(1) Unless otherwise authorized or required by Licensor, Licensee shall (i) use the Marks only in connection with the operation of the Restaurant, and Licensee shall not use the Marks as part of it's

corporate or other legal name.

    (2)    Licensee shall not use the Marks to incur any obligation or indebtedness on behalf of the Licensor.

D.    Licensee shall notify Licensor immediately of any apparent infringement of or challenge to Licensee's use of any Mark, of any claim by any person of any rights in any Mark, and Licensee shall not communicate with any person other than Licensor or any designated affiliate thereof, their counsel and Licensee's counsel and others who have a need-to-know, in connection with any such infringement, challenge or claim. Licensor shall have complete discretion to take such action as it deems appropriate in connection with the foregoing, and the right to control exclusively, or to delegate control to any of its affiliates of, any settlement, litigation or proceeding in the Patent and Trademark Office or any other forum arising out of any such alleged infringement, challenge or claim otherwise relating to any Mark. Licensee agrees to execute any and all reasonable instruments and documents, tender such reasonable assistance, and do such reasonable acts or things as may reasonably be necessary or advisable to protect and maintain the interests of Licensor or any affiliate in any litigations or proceeding in the Patent Trademark Office or any other forum, or to otherwise protect and maintain the interests of Licensor or any other interested party in the Marks. Licensor will indemnify Licensee against and reimburse Licensee for all damages for which Licensee is held liable in any proceeding arising out of Licensee's use of any of the Marks (including settlement amounts), provided that the conduct of Licensee with respect to such proceeding and use of the Marks is in full compliance with the terms of this Agreement.

E.    The right and license of the Marks granted hereunder to Licensee is nonexclusive and Licensor and its affiliates thus have and retain the following rights, among others, subject only to the limitations of Section I:

    (1)    To grant other licenses for use of the Marks, in addition to those licenses already granted to existing licensees;

    (2)    To develop and establish other systems using the Marks or other names or marks and to grant licenses thereto without providing any rights to Licensee; and

    (3)    To engage, directly or indirectly, through their employees, representatives, licensees, assigns, agents and others, at wholesale, retail or otherwise, in the production, distribution, license and sale of products and services utilizing the Marks and any and all trademarks, trade names, service marks, logos, insignia, slogans, emblems, symbols, designs and other identifying characteristics as may be developed or used from time to time by Licensor.

## SECTION VII- **INSURANCE.**

A.    Prior to the Opening Date, Licensee shall procure and shall maintain in full force and effect at all times during the term of this Agreement at Licensee's expense, an insurance policy or policies protecting Licensee and Licensor and its affiliates, successors and assigns, against any claim or occurrence of personal injury, death or property damage, or any loss, liability or expense whatsoever, arising or occurring upon or in connection with the use of the Marks and or Products.

## SECTION VIII - **TRANSFER OF INTEREST.**

A.    Licensee understands and acknowledges that the right and duties set forth in this Agreement are personal to Licensee, and that Licensor has granted rights under this Agreement in reliance on the business skill; financial capacity and personal character of Licensee: Accordingly; Licensee, nor any successor or assign of Licensee, shall sell, assign, transfer, convey, give way, pledge, mortgage or otherwise encumber any direct or indirect interest in this agreement without the prior written consent of Licensor. Any purported

assignment or transfer, by operation of law or otherwise made in violation of this Agreement shall be null and void and shall constitute a material event of default under this Agreement.

### SECTION IX - INDEMNIFICATION.

A.  Licensee shall, at all times, indemnify and hold harmless to the fullest extent permitted by law Licensor from all "losses and expenses" incurred in connection with any action, suit, proceeding, claim, demand, investigation or inquiry (formal or informal) or any settlement thereof which arises out of or is based the use of the Marks or Products

B.  Licensee agrees to give Licensor notice of any such action, suit, proceeding, claim, demand, inquiry, or investigation. At the expense and risk of Licensee, Licensor may elect to assume (but under no circumstances is obligated to undertake) or associate counsel of his own choosing with respect to, the defense and/or settlement of any such action, suit, proceeding, claim, demand, inquiry or investigation. Such an undertaking by Licensor shall, in no manner or form, diminish the obligation of Licensee to indemnify the Licensor and to hold Licensor harmless.

### SECTION X - TERMINATION.

A.  (1)  Licensee acknowledges and agrees that each of Licensee's obligations described in this Agreement is a material and essential obligation of Licensee; that nonperformance of such obligations will adversely and substantially affect the Licensor; and that, in the event of such nonperformance, the exercise by Licensor of the rights and remedies set forth herein is appropriate and reasonable.

(2)  Licensee shall be deemed to be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Licensee, if Licensee shall become insolvent or makes a general assignment for the benefit of creditors; files a voluntary petition for bankruptcy law; a proceeding for the appointment of a receiver is instituted; or if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless supersedes bond is filed).

(3)  Licensee shall be deemed to be in material default and Licensor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Licensee any opportunity to cure the default, effective immediately upon this notice to Licensee, upon the occurrence of any of the following events:

(a)  If Licensee breaches any provision of this Agreement as to the use of unauthorized food, beverage and paper products, signage or advertising materials;

(b)  If Licensee is convicted of, or has entered a plea <u>of novo contendere</u> to, a felony, a crime involving moral turpitude, or any other crime or offense that Licensor believes is reasonably likely to have adverse effect on the System, the Marks, the goodwill associated therewith, or Licensor's interests therein;

(c)  If Licensee shall knowingly or recklessly serve in the Restaurant food, which has, been adulterated, such that it represents a threat or danger to public health or safety-

(4)  In the event of any breach by Licensee of any of its obligations under this Agreement, except for those set forth in Section XII.A.2 and XII.A.3 above, Licensor may terminate this Agreement after giving written notice of the event of breach to Licensee, unless the Licensee shall have, within fifteen (15) days after receipt of said notice, cured the breach.

B.  In the event of any breach by Licensor of any of its obligations under this Agreement, Licensee

may terminate this Agreement after giving written notice of the event of breach to Licensor; unless the Licensor shall have, within fifteen (15) days after receipt of said notice, cured the breach.

C.  Except as otherwise provided in this Agreement and in addition to any other rights and remedies that may exist, upon defaults by Licensee, Licensor may terminate this Agreement by giving written notice of termination stating the nature of such default to Licensee.

## SECTION XI- POST TERMINATION

Upon termination or expiration of this Agreement, all rights granted hereunder to License shall forthwith terminate, and:

A.  Licensee shall immediately cease using the Marks and Products licensed under this Agreement, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former licensee of Licensor, In particular Licensee shall cease to use, without limitation, all signs, advertising materials, displays, stationery, forms, an any other articles which display the Marks.

B.  Licensee shall, in the event of expiration of this Agreement or termination by Licensor, promptly pay all sums due and owing to Licensor and its subsidiaries or affiliates. Such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Licensor as a result of a violation by Licensee of this Agreement or as a result of any default by Licensee, which obligation shall give rise to and remain, until paid in full,

C.  Licensee shall immediately furnish Licensor an itemized list of all signs, advertising and sales promotion materials, display, stationery, forms and any other articles bearing the Marks or any of Licensor's distinctive markings, designs, labels, or other marks thereon, under Licensees control; and Licensor shall have the right to inspect these materials; and Licensor shall have the option, exercisable within thirty (30) days after such inspection, to purchase any or all of the materials at Licensee's cost. Licensee or any other party shall not utilize materials not purchased by Licensor for any purpose unless authorized in writing by Licensor.

## SECTION XII - MISCELLANEOUS.

A.  Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered or mailed by expedited delivery service or certified or registered mail, return receipt requested, first-class postage paid, or sent by prepaid facsimile, telegram or telex (provided that the sender confirms the facsimile, telegram or telex by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission) to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

Notices to Licensor:
TK&C's LLC
PO Box 5474
Lafayette In, 47903

Notices to Licensee:
_____
_____

Any notice shall be deemed to have been given at the time of personal delivery or, in the case of facsimile, telegram or telex, upon transmission (provided confirmation is sent as described above) or, in the case of

expedited delivery service or registered or certified mail, three (3) business days after the date and time of mailing.

B.  This Agreement, the documents referred to herein, and the attachments hereto, constitute the entire, full and complete agreement between Licensor and Licensee concerning the subject matter hereof and shall supersede all prior related agreements between Licensor and Licensee. Except for those permitted to be made unilaterally by Licensor hereunder, no amendment, change or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers, representatives or agents in writing.

## SECTION XIII - ACKNOWLEDGMENTS.

A.  Licensee acknowledges that it has conducted an independent investigation of the business venture contemplated by this Agreement and recognized that the success of this business venture involves substantial business risks and will largely depend upon the ability of Licensee.

B.  Licensee acknowledges that Licensee has received, read and understands this Agreement and that Licensor has afforded Licensee sufficient time and opportunity to consult with advisors selected by Licensee about the potential benefits and risks of entering into this Agreement.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed by its duly authorized representatives as of the date first above written.

LICENSOR:

TK&C's LLC
An Indiana Corporation
By: _Carol A Van Dame_
Name: _CAROL A VAN DAME_
Title: _PRESIDENT_

LICENSEE:

_David J. Hosticka_
DAVID J. Hosticka
President

By _[signature]_
Name BRIAN E. HOSTICKA
Title Vice PRESIDENT

Date July 1, 2007

Addendum to the Dog n Suds Marks and Product License Agreement for Airline Dog n Suds Inc.

Section I: Grant: Para A: Licensor agrees to a 10 year term for this agreement..
    Para C: Licensor grants to Licensee the exclusive rights during the term of this Agreement to obtain the Dog n Suds Marks and Product License Agreement for the following counties in the State of Michigan Allegan, Kent, Mason, Muskegon, Newaygo, Oceana and Ottawa. The fee for this exclusive right is Twenty Five Hundred Dollars ($2,500.00). Due at the time of signing this Agreement. Furthermore as the Licensee obtains the Licence Agreement in any of the above mention counties. Licensor will deduct Five Hundred Dollars ($500.00) from that License Agreement

Section III: Term and Renewal: Licensor agrees to an 10 year period..

Section IV: Fees: Para A. Licensor hereby waives any license fee relating to the Licensee's operating the restaurant specifies in Section I above
    Para B. Licensee shall pay to Licensor a license fee of five thousand dollars ($5,000.00) for each addition future License Agreement pursuant to the counties listed in Section I: Para C:

IN WITNESS WHERE OF, the parties has caused this ADDENDUM to be a part of the original Dog n Suds Marks and Product Agreement between TK&C's LLC and Airline Dog and Suds Inc

LICENSOR:
TK&C's LLC
An Indiana Corporation
By: Carol A Van Dame
Name Carol A Van Dame
Title President

LICENSEE;

Airline Dog n Suds Inc,
By: [signature]
Name David J Hostrelca
Title President

By: [signature]
Name Brian Hosticka
Title Vice President